**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.** _____

**TATONKA CAPITAL CORPORATION,**

     **Plaintiff,**

**v.**

**TRILLION PARTNERS, INC.,**

     **Defendant.**

---

## COMPLAINT

---

    **COMES NOW** the plaintiff in this action, Tatonka Capital Corporation ("Tatonka") and for its Complaint against Trillion Partners, Inc. ("Trillion"), hereby states as follows:

### JURISDICTION AND VENUE

    1.    Tatonka is a corporation organized according to the laws of the State of Colorado, having its principal place of business in Denver, Colorado.

    2.    Trillion is a corporation organized according to the laws of the State of Delaware, having its principal place of business in Austin, Texas, and does business in Colorado.

    3.    The amount in controversy, exclusive of interest and costs, exceeds $75,000.00 and complete diversity exists between Tatonka on the one hand and Trillion on the other.

    4.    This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

    5.    Venue is proper pursuant to 28 U.S.C. § 1391(a).

6.     Specifically, Trillion consented to in personam jurisdiction in this forum by, among other things, entering into multiple contracts with Tatonka that provide for actions or proceedings arising between the parties to take place in this forum.  For example, the RMPA (defined below) states,

> The parties hereto agree that all actions or proceedings arising in connection with this Replacement Master Agreement shall be tried and litigated exclusively in the State and Federal courts located in the City and County of Denver, State of Colorado.   The aforementioned choice of venue is intended by the parties to be mandatory and not permissive in nature, thereby precluding the possibility of litigation between the parties with respect to or arising out of this Replacement Master Agreement in any jurisdiction other than that specified in this Section….

See Evidentiary Submission Exhibit A at ¶ 30.

## STATEMENT OF FACTS

## I.     THE FEDERAL SCHOOLS AND LIBRARIES PROGRAM (E-RATE)

7.     More than a decade ago Congress enacted into law the so-called E-Rate program.  The United Service Administrative Company ("USAC"), with the oversight of the Federal Communications Commission ("FCC"), administers the federal Schools and Libraries Program, which is commonly referred to as "E-Rate."  The Schools and Libraries Program, or E-Rate, enables eligible schools and libraries to receive telecommunications and internet service from private carriers, also known as "service providers," at reduced costs due to subsidies paid by USAC.

8.     Each year a school system can apply for federal funding for various types of access to the internet for the schools to be used by administration, teachers, and students.  The

application includes a competitive biding process in which service providers (like Trillion, in the instant case) can bid on the various contracts.  Some contracts are approved, some are not.

9.      Trillion provides telecommunication services to schools ("Customers").  Trillion participates in E-Rate as a service provider and originates some Service Agreements with school district Customers to provide telecommunications and internet services.  In accordance with the Service Agreements, Trillion receives payments for its services directly from its Customers (the school districts), as well as the subsidy payments from USAC.

10.     To provide such services, Trillion installs certain telecommunications and other equipment ("Equipment") at the Customers' and other locations.  Trillion requires each Customer to enter into a contract with Trillion that describes Trillion's services to the Customer and the related Equipment ("Service Agreements").  Tatonka and Trillion have entered into numerous agreements whereby Tatonka either purchased certain Service Agreements from Trillion or otherwise provided financing to Trillion, in exchange for blanket liens on all of Trillion's assets, including (i) Trillion's right to receive payments under the Service Agreements and (ii) Trillion's equity interest in its subsidiary special purpose entity, Trillion, LLC ("Trillion-Sub").  Under all scenarios, Trillion continues to service the Service Agreements and deliver the services to the Customer provided for in the Service Agreement.

11.     Trillion, through its Service Agreements provides internet and telecommunication service to over half a million students, a substantial portion of which are in Colorado.

## II.  THE LOAN AGREEMENTS

### A.  "THE REPLACEMENT MASTER PURCHASE AGREEMENT"

12.    On or about March 1, 2006, Tatonka and Trillion entered into that certain Replacement Master Purchase Agreement (the "RMPA") whereby Tatonka agreed to purchase up to $55,000,000 of Service Agreements from Trillion.

13.    The RMPA replaces in its entirety that certain Master Purchase Agreement (the "MPA") dated October 1, 2004 by and between Tatonka and Trillion.

14.    Pursuant to the RMPA, Trillion could present Services Agreements to Tatonka for Tatonka to decide whether it would purchase the agreements.  For each Service Agreement Tatonka agreed to purchase (collectively, the "RMPA Transferred Services Agreements"), Tatonka purchased the Service Agreement from Trillion for an agreed upon price pursuant to the RMPA.

15.    Pursuant to the RMPA, Trillion is obligated to make certain payments to Tatonka and to pay Tatonka an annual percentage rate of return on the money Tatonka paid to Trillion to purchase the RMPA Transferred Services Agreements.

### i.  Continuing Service Agreement

16.    In conjunction with the RMPA, Trillion and Tatonka entered into a Continuing Obligations Agreement dated March 1, 2006 (the "Continuing Obligations Agreement") whereby Tatonka engaged Trillion to provide all the duties and obligations of Tatonka, as assignee of Trillion, under the RMPA Transferred Service Agreements, including: obtaining, installing and servicing the Equipment; monitoring the performance of the Equipment; maintaining service relations with transferred Customers; and maintaining service response

4

centers for transferred Customers.   The Continuing Obligations Agreement is currently in full force and effect.

          ii.    <u>RMPA Collateral</u>

17.   For each RMPA Transferred Services Agreement, Trillion executed and delivered a Security Agreement (the "RMPA Security Agreements") to Tatonka whereby Trillion granted to Tatonka a first priority lien on and security interest in: (1) all Equipment associated with the Service Agreement; (2) proceeds and products of the Equipment; and (3) all rights to payment under the respective Services Agreement (collectively, the "RMPA Collateral").

18.   For each RMPA Transferred Services Agreement, Tatonka filed a financing statement in Delaware (the "RMPA Financing Statements") pursuant to its right to do so under the respective RMPA Security Agreement.

**B.    <u>"THE HOLD FACILITY LOAN" AND TRILLION, LLC</u>**

19.   On or about July 31, 2008, Trillion organized a subsidiary special purpose entity, Trillion-Sub, as evidenced by that certain Operating Agreement of Trillion, LLC (the "Trillion-Sub Operating Agreement").

20.   On or about July 31, 2008, Tatonka made a loan to Trillion-Sub in the maximum principal amount of $25,000,000.00 to finance certain Service Agreements and their related collateral (the "Hold Facility Loan").   Under the Hold Facility Loan, all Service Agreements would continue to be procured by Trillion, and Trillion (not Trillion-Sub) would individually be the party to all Service Agreements.   All Service Agreements that were financed pursuant

to the Hold Facility Loan (the "Hold Facility Service Agreements") would be sold by Trillion to Trillion-Sub.

21.     Trillion is the sole member of Trillion-Sub and therefore owns 100% of the equity interests of Trillion-Sub.  Pursuant to the Trillion-Sub Operating Agreement, there were initially three managers of Trillion-Sub, one of which was the Independent Manager (as defined in the Trillion-Sub Operating Agreement).  Trillion, as the sole member of Trillion-Sub, may remove all present managers of Trillion-Sub and may appoint itself as a manager; however, there must also be an Independent Manager until all amounts owing under the Hold Facility Loan are paid in full.

22.     Trillion-Sub has no employees.  By contract, all of the Hold Facility Service Agreements and the related networks are in fact managed and serviced by Trillion and its employees.

23.     Trillion has been the only servicer of the Hold Facility Service Agreements. Trillion is currently acting as the servicer of the Hold Facility Service Agreements and their related networks.

24.     Tatonka assigned its interest in the Hold Facility Loan and all related documents (collectively, the "Hold Facility Loan Documents") to Tatonka's subsidiary special purpose entity, Tatonka Funding LLC ("Funding").

C.      **"THE CONSTRUCTION AND WORKING CAPITAL FACILITY"**

        i.      The CWC Loan

25.     On or about July 31, 2008, Tatonka made a loan to Trillion in the maximum principal amount of $8,000,000 (the "CWC Loan").  The CWC Loan is evidenced by that

certain Construction and Working Capital Loan Agreement dated July 31, 2008 between Trillion and Tatonka (together with all amendments thereto, the "CWC Loan Agreement").

26.     The CWC Loan Agreement has two components: (1) $7,500,000 of the proceeds would be available to fund the construction of telecommunications systems for Trillion's Customers under various Service Agreements (the "Construction Loan"); and (2) as much as $500,000 of the proceeds would be available to fund Trillion's working capital (the "Working Capital Loan").  Under the Construction Loan, when the construction of a certain network was complete, the money Trillion borrowed to finance that specific network was to be repaid and the corresponding lien released, and then the respective Service Agreement would be sold by Trillion to Trillion-Sub pursuant to the Hold Facility Loan Documents, with the purchase price funded by a draw on the Hold Facility Loan.  Trillion would then use the sales proceeds received from Trillion-Sub to pay down the Construction Loans.

    ii.     The CWC Notes

27.     In accordance with the CWC Loan Agreement, Trillion executed and delivered to Tatonka two promissory notes payable to Tatonka to evidence the CWC Loan, one in the maximum principal amount of $7,500,000 (the "Revolving Construction Note") and the other in the original principal amount of $500,000 (the "Working Capital Note" and together with the Revolving Construction Note, the "CWC Notes").

28.     The CWC Loan Agreement, the CWC Notes and all other agreements, documents and instruments related to the CWC Loan Agreement or the CWC Loans are hereinafter referred to as the "CWC Loan Documents."

    iii.     The CWC Collateral

29.    Trillion's obligations owing to Tatonka pursuant to the CWC Notes and the CWC Loan Agreement are secured by (i) a security agreement dated July 31, 2008, in which Trillion granted a security interest in all of Trillion's assets in favor of Tatonka (the "CWC Security Agreement"), and (ii) a UCC financing statement (the "August 4, 2008 Financing Statement") filed with the Delaware Secretary of State on August 4, 2008 (#2008-2666251) perfecting Tatonka's security interest in the collateral.

iv.    The Mezzanine Loan

30.    On or about July 31, 2008, Global Leveraged Primary Credit Fund, LLC ("GLC") made a loan to Trillion in an aggregate principal amount not exceeding $12,780,000 (plus any interest paid in kind or capitalized) (the "Mezzanine Loan"), and in connection therewith Trillion executed and delivered one or more promissory notes evidencing the Mezzanine Loan (whether one or more, the "Mezzanine Note").  The Mezzanine Loan is governed by the terms of that certain Mezzanine Loan and Security Agreement dated July 31, 2008 by and between Trillion and GLC (together with all amendments thereto, the "Mezzanine Loan Agreement").

v.    The CWC Subordination and Intercreditor Agreement

31.    In conjunction with the CWC Loan and the Mezzanine Loan, Tatonka, Trillion and GLC entered into Subordination and Intercreditor Agreement dated July 31, 2008 (together with all amendments thereto, the "Subordination Agreement") whereby GLC agreed that its right to receive payments owing by Trillion under the Mezzanine Loan (except for certain Permitted Payments [as defined in the Subordination Agreement]) was subordinate to

Tatonka's right to receive payments owing by Trillion under Tatonka's various loan agreements with Trillion.

<u>vi.</u>    <u>The Escrow Agreement</u>

32.    In conjunction with the Hold Facility Loan, the CWC Loan and the Mezzanine Loan, Tatonka, Funding, Trillion, Trillion-Sub, GLC and certain other parties entered into that certain Amended and Restated Escrow Agreement dated July 31, 2008 (the "Escrow Agreement") whereby U.S. Bank National Association (the "Escrow Agent") agreed to serve as escrow agent of a certain deposit account with U.S. Bank (the "Escrow Account"), which was registered with U.S. Bank in the name of Tatonka and owned by Tatonka pursuant to the Escrow Agreement.

33.    The E-Rate rules and regulations provide that USAC will deliver subsidy payments for an E-Rate service provider, such as Trillion, to only one remittance account. Trillion has designated the Escrow Account as its USAC remittance account. Accordingly, all USAC subsidy payments for all of Trillion's and Trillion-Sub's Service Agreements are deposited into the Escrow Account. Additionally, all payments from Trillion's Customers under the Service Agreements are deposited into the Escrow Account.

34.    Pursuant to the Escrow Agreement, the Escrow Agent could disburse funds in the Escrow Account, including earnings and interest, only in accordance with written instructions signed by Tatonka (or by Tatonka's lender in certain circumstances).

**D.    "THE FEBRUARY 2009 TRANSACTION"**

i.    <u>The February 2009 Purchase Agreement</u>

35.    On or about February 20, 2009, Tatonka and Trillion entered into that certain Contract Purchase Agreement (the "February 2009 Purchase Agreement") whereby Tatonka purchased certain Service Agreements (the "February 2009 Service Agreements") from Trillion for $3,500,000.

36.    In conjunction with the February 2009 Purchase Agreement, Trillion executed a Bill of Sale on February 20, 2009 (the "February 2009 Bill of Sale") whereby Trillion sold the February 2009 Service Agreements to Tatonka.  Trillion retained the right to repurchase the Service Agreements sold pursuant to February 2009 Purchase Agreement.

37.    Pursuant to the February 2009 Purchase Agreement, Tatonka agreed to sell the February 2009 Service Agreements back to Trillion after Trillion made certain scheduled payments.

38.    In conjunction with the February 2009 Purchase Agreement, Trillion and Tatonka entered into a Continuing Obligations Agreement dated February 20, 2009 (the "February 2009 Continuing Obligations Agreement") whereby Tatonka engaged Trillion to provide all the duties and obligations of Tatonka, as assignee of Trillion, under the February 2009 Service Agreements, including: obtaining, installing and servicing the related Equipment; monitoring the performance of the Equipment; maintaining service relations with related Customers; and maintaining service response centers for Customers.   The February 2009 Continuing Obligations Agreement is currently in full force and effect.

ii.    The February 2009 Loan

39.    In conjunction with the February 2009 Purchase Agreement, Tatonka made a loan to Trillion in the maximum principal amount of $2,225,000 (the "February 2009 Loan",

and together with the sale that is evidenced by the February 2009 Purchase Agreement, the "February 2009 Transaction"). The February 2009 Loan is evidenced by that certain *Revolving Loan Agreement* dated February 20, 2009 between Trillion and Tatonka (together with all amendments, the "February 2009 Loan Agreement").

40.     The February 2009 Loan financed working capital needs of Trillion and certain payments owing to Tatonka under the February 2009 Purchase Agreement and other agreements.

41.     The February 2009 Transaction was in essence a floating line of credit, the availability of which was dependent on other obligations owing to Tatonka.  Specifically, the amount of credit available to Trillion under the February 2009 Loan Agreement was tied to the balance owing to Tatonka under the February 2009 Purchase Agreement.  When Trillion made a payment on the February 2009 Purchase Agreement, the credit available under the February 2009 Loan Agreement increased accordingly.

### iii.     The February 2009 Note

42.     In accordance with the February 2009 Loan Agreement, Trillion executed and delivered a promissory note payable to Tatonka in the maximum principal amount of $2,225,000 (the "February 2009 Note").

43.     The February 2009 Loan Agreement, the February 2009 Note and all other agreements, documents and instruments related to the February 2009 Loan Agreement or the February 2009 Loans are hereinafter referred to as the "February 2009 Loan Documents."

### iv.     The February 2009 Collateral

44.     Trillion's obligations owing to Tatonka pursuant to the February 2009 Note, the February 2009 Loan and the February 2009 Purchase Agreement were originally secured by one security agreement that was executed in February 2009; however, the parties subsequently agreed to separate the security agreements as more specifically described below.

45.     Trillion's obligations owing to Tatonka pursuant to the February 2009 Loan Agreement and the February 2009 Note are secured by (i) a security agreement dated February 20, 2009, in which Trillion granted a security interest in all of Trillion's assets in favor of Tatonka (together with all amendments, the "February 2009 Security Agreement"), and (ii) the August 4, 2008 Financing Statement.

46.     Trillion's obligations owing to Tatonka pursuant to the February 2009 Purchase Agreement are secured by (i) a security agreement dated April, 2009 (the "April 2009 Security Agreement"), in which Trillion granted in favor of Tatonka a security interest in, among other things, certain Equipment and proceeds thereof, and (ii) the August 4, 2008 Financing Statement.

**E.      "THE JUNE 2009 BRIDGE LOAN"**

47.     On or about June 20, 2009, Tatonka made a loan to Trillion in the maximum principal amount of $849,848.08 (the "June 2009 Bridge Loan").  The June 2009 Bridge Loan is evidenced by that certain Revolving Loan Agreement dated June 30, 2009 between Trillion and Tatonka (together with any and all amendments thereto, the "June 2009 Loan Agreement").

48.     The June 2009 Bridge Loan funded certain payments owing under the RMPA.

i.      <u>The June 2009 Note</u>

49.     In accordance with the June 2009 Loan Agreement, Trillion executed and delivered a promissory note payable to Tatonka in the maximum principal amount of $849,848.08 (the "June 2009 Note").

50.     The June 2009 Loan Agreement, the June 2009 Note and all other agreements, documents and instruments related to the June 2009 Loan Agreement or the June 2009 Bridge Loan are hereinafter referred to as the "June 2009 Loan Documents."

ii.     The June 2009 Bridge Loan Collateral

51.     Trillion's obligations owing to Tatonka pursuant to the June 2009 Note and the June 2009 Loan Agreement are secured by (i) a security agreement dated June 30, 2009, in which Trillion granted a security interest in all of Trillion's assets in favor of Tatonka (the "June 2009 Security Agreement"), and (ii) the August 4, 2008 Financing Statement.

**F.     THE AUGUST 2009 DEFAULT LETTERS AND "THE OCTOBER 2009 TRANSACTION"**

i.     The August 2009 Default Letters

52.     In August 2009, Tatonka sent letters (the "August 2009 Default Letters") to Trillion setting forth certain events of default (the "Noticed Defaults") that had occurred under the RMPA Loan Documents, the CWC Loan Documents, the February 2009 Loan Documents and the June 2009 Loan Documents, including Trillion's failure to make payments when due.

ii.     The Restructuring Agreement

53.     Trillion requested that Tatonka waive the Noticed Defaults.  To induce Tatonka to grant the waiver requests, Trillion agreed to, among other things, (1) make certain amendments to the CWC Loan and the Hold Facility Loan and (2) assign to Tatonka certain anticipated payments totaling $573,800.80.  The agreements are evidenced by that certain

*Restructuring Agreement* dated October 20, 2009 by and between Trillion, Tatonka and Funding (the "Restructuring Agreement").

54.　　GLC consented to the Restructuring Agreement.

55.　　Pursuant to the Restructuring Agreement, the maturity date for the CWC Loan was amended from July 29, 2011 to April 1, 2010 and Trillion assigned to Tatonka its right to receive certain anticipated payments totaling $573,800.80 (the "USAC Payments") to be received by Trillion from the USAC.

### iii.　　The October 2009 Note

56.　　In accordance with the Restructuring Agreement, Trillion executed and delivered to Tatonka a promissory note payable to Tatonka in the principal amount of $573,800.80 (the "October 2009 Note").

57.　　The Restructuring Agreement, the October 2009 Note and all other agreements, documents and instruments related to the October 2009 Transaction are hereinafter referred to as the "October 2009 Loan Documents."

58.　　The RMPA Loan Documents, the CWC Loan Documents, the February 2009 Loan Documents, the June 2009 Loan Documents and the October 2009 Loan Documents are hereinafter referred to as the "Trillion Tatonka Loan Documents."

59.　　The maturity date of the October 2009 Note occurred on July 1, 2010 (the "October 2009 Note Maturity Date").

### iv.　　The Restructuring Fee and Related Documents

60.     In conjunction with the Restructuring Agreement, Trillion agreed to pay a $500,000 restructuring fee (the "Restructuring Fee") to Tatonka as compensation for costs incurred by Tatonka and Funding due to the Noticed Defaults.

61.     Tatonka agreed to allow Trillion to defer payment of the Restructuring Fee pursuant to that certain Deferred Payment Agreement dated October 20, 2009 (the "Deferred Payment Agreement"), whereby Trillion agreed to pay to Tatonka the Restructuring Fee prior to or upon the sale, liquidation, assignment or any other such transfer of or involving the Equity Interest (as defined below) of Trillion-Sub.

62.     In conjunction with the Restructuring Agreement and the Deferred Payment Agreement, Trillion and Trillion-Sub executed that certain Equity Interest Pledge Agreement (the "Pledge Agreement"), whereby Trillion pledged its equity interests in Trillion-Sub (the "Equity Interest"), which constitutes 100% of the equity interests in Trillion-Sub, to Tatonka as collateral for Trillion's obligations to Tatonka under the Deferred Payment Agreement (the "Deferred Payment Obligations").

## G.     CROSS DEFAULT AND CROSS COLLATERALIZATION

63.     Every time a subsequent loan was entered into, Trillion and Tatonka entered into amendments to all then-existing loans and to the Subordination Agreement to ensure that the Trillion Tatonka Loan Documents were all cross-defaulted and cross-collateralized.

## III.     USAC/E-RATE ISSUES

64.     USAC must approve certain payments under the Service Agreements and the Hold Facility Service Agreements.  USAC unilaterally determined that approximately $14

million of payments (the "Disputed Payments") that are due to Trillion under either the Service Agreements or the Hold Facility Service Agreements were and are not payable.

65.     Specifically, USAC asserts that it cannot pay Trillion because Trillion failed to comply with certain regulations, some of which were promulgated subsequent to Trillion's conduct in question.   Regardless of the merits of the USAC dispute and the related proceedings (the "Proceedings"), Trillion is taking steps seeking to be paid the Disputed Payments.  Even though Trillion has been pursuing payment of the Disputed Payments for a year, there appear to have been no recent significant developments.   Moreover, given the procedural posture of the Proceedings, it will most likely take at least several months for Trillion to receive the Disputed Payments if USAC decided tomorrow that the Disputed Payments were due to be paid.

66.     Tatonka has a properly perfected lien in the Disputed Payments pursuant to the Trillion Tatonka Loan Documents.

## IV.     EXISTING DEFAULTS

67.     Trillion has failed and/or refused to pay all amounts due and owing under the Trillion Tatonka Loan Documents.

68.     Under the RMPA, Trillion is obligated to make annual interest payments to Tatonka.  Trillion failed to make the interest payment due on March 31, 2011, which failure constitutes an event of default under the RMPA (the "RMPA Payment Default").   The principal amount outstanding on the RMPA, exclusive of interest, attorneys' fees, costs, and other charges, is in excess of $12,400,000.00.   The outstanding principal balance of the

RMPA, together with past due interest and other charges, remains due and owing under the RMPA.

69.     Under the CWC Loan, Trillion is obligated to, among other things, (1) make monthly interest payments to Tatonka and (2) pay the principal amount owing on the final maturity date.  Pursuant to the Restructuring Agreement, the final maturity date of the CWC Loan occurred on April 1, 2010 (the "CWC Maturity Date").  Trillion has failed to pay the principal amount owing under the CWC Loan, despite the occurrence of the CWC Maturity Date. These failures constitute events of default under the CWC Loan Documents (the "CWC Payment Default").   The principal amount outstanding on the CWC Loan, exclusive of interest, attorneys' fees, costs, and other charges, is in excess of $3,800,000.  The outstanding principal balance of the CWC Loan, together with past due interest and other charges, remains due and owing under the CWC Loan.

70.     Under the February 2009 Loan, Trillion is obligated to, among other things, (1) make monthly interest payments to Tatonka and (2) pay the principal amount owing to Tatonka on the final maturity date.  Under the February 2009 Purchase Agreement, Trillion is obligated to, among other things, (1) make annual principal payments to Tatonka and (2) make monthly interest payments to Tatonka.  Trillion has failed to make monthly interest payments and annual principal payments when due.  These failures constitute events of default under the February 2009 Loan Documents (the "February 2009 Transaction Payment Default").   The principal amount outstanding on the February 2009 Transaction, exclusive of interest, attorneys' fees, costs, and other charges, is in excess of $5,900,000.  The outstanding principal

balance of the February 2009 Transaction, together with past due interest and other charges, remains due and owing under the February 2009 Transaction.

71.     Under the June 2009 Bridge Loan, Trillion is obligated to, among other things, (1) make monthly interest payments to Tatonka and (2) pay the principal amount owing to Tatonka on the final maturity date.  The final maturity date occurred on November 15, 2009 (the "Bridge Loan Maturity Date").  Trillion has failed to make the principal payment, despite the occurrence of the Bridge Loan Maturity Date.  This failure constitutes an event of default under the June 2009 Bridge Loan (the "June 2009 Bridge Loan Payment Default").  The principal amount outstanding on the June 2009 Bridge Loan, exclusive of interest, attorneys' fees, costs, and other charges, is in excess of $1,200,000.  The outstanding principal balance of the June 2009 Bridge Loan, together with past due interest and other charges, remains due and owing under the June 2009 Bridge Loan.

72.     Under the Restructuring Agreement, Trillion was obligated to pay the entire outstanding principal amount of the October 2009 Note, together with all accrued and unpaid interest hereunder on the October 2009 Note Maturity Date (July 1, 2010).  Trillion has failed to pay the principal amount owing under the October 2009 Note, despite the occurrence of the October 2009 Note Maturity Date.  These failures constitute events of default under the Restructuring Loan Documents (the "October 2009 Note Payment Default").  The principal amount outstanding on the October 2009 Loan, exclusive of interest, attorneys' fees, costs, and other charges, is in excess of $580,000.  The outstanding principal balance of the October 2009 Loan, together with past due interest and other charges, remains due and owing under the October 2009 Loan.

73.    As stated above, all the Trillion Tatonka Loans are cross-defaulted. Accordingly, each of the above-referenced defaults constitutes an event of the default under the other Trillion Tatonka Loans Documents.

74.    The total amount now immediately due and owing from Trillion to Tatonka exceeds $30 million.

## V.    THE NEED FOR A  RECEIVER

75.    Under the CWC Loan Agreement, the February 2009 Loan Agreement and the June 2009 Loan Agreement, Trillion expressly and unequivocally agreed to appointment of a receiver, without prior notice, upon default.  Specifically, Section 7.02(g) of the CWC Loan Agreement, the February 2009 Loan Agreement and the June 2009 Loan Agreement provides:

> **Section 7.02  Remedies.**  Subject to the Subordination and Intercreditor Agreement, upon and after the occurrence of an Event of Default, [Tatonka] may, at its election, without notice of its election and without notice to or demand upon [Trillion], do any one or more of the following:
>
> > (g) Petition for and obtain the appointment of a receiver, without notice of any kind whatsoever, to take possession of any or all of the Collateral and business of [Trillion] and to exercise such rights and powers as the court appointing such receiver shall confer upon such receiver.
>
> See Evidentiary Submission Exhibit L at ¶ 7.02(g).

76.    Trillion is in a substantial, continuing, payment default to its senior secured lender Tatonka for more than $30 million.

77.    Tatonka has the right under its contracts and applicable law to take possession of its collateral (the operating assets of Trillion) and effectively cease Trillion's operations.  But such self-help action would eliminate the going concern value of Trillion, would eliminate forty jobs, and over half a million school children's access to the internet at schools.

78.     Moreover, Trillion's operations and cash flow would have already been impacted, but for Tatonka's cooperation thus far as Trillion's senior secured creditor.

79.     Trillion continuously supplies Tatonka with financial statements reflecting Trillion's current cash position (the "Financial Statements").

80.     Trillion's Financial Statements establish that Trillion does not have the necessary funds to meet its financial obligations under its loans from Tatonka.

81.     The highest and best value of Tatonka's collateral (which is essentially the assets and operations of Trillion) is as a going concern.  There is much less value in Trillion's assets after it has discontinued operations than in a company that continues as a going concern.

82.     Trillion was, is, and remains unable to cure these major defaults to its senior secured lender, Tatonka.

83.     All of Trillion's Board of Directors resigned months ago, and thus, Trillion has no formal leadership.

84.     Trillion's lack of a Board of Directors has made it impossible for Tatonka (or anyone else) to enter into any restructuring arrangements or new financing arrangements with Trillion or otherwise address the difficult issues presented by Trillion's continuing defaults.

85.     A  receiver could and would fill most of the role abandoned by Trillion's non-existent Board of Directors.

86.     Among other issues, Trillion's key employees had some form of bonus compensation structure that expired around December 31, 2010.

87.     These key employees have asked Tatonka for some sort of bonus or arrangement to encourage their retention with the company.

88.     Tatonka has responded to these key employees by saying that it is only a lender and cannot make this type of decision on Trillion's behalf.   However, a receiver could determine whether such a program was in the best interests of Trillion, and if so, take the steps necessary to implement such a program.

89.     Trillion has been awarded new service agreements, some with Customers new to Trillion.   To implement these new service agreements, Trillion needs to acquire and install considerable telecommunications equipment with each new service agreement.

90.     Trillion needs a cash infusion of about $4 million for capital expenditures to build out the infrastructure for these new service agreements.   Trillion has been unable to obtain this needed financing.

91.     Trillion's controlling shareholder, Meritage Venture Partners ("Meritage"), has advised Tatonka repeatedly that it has written off its investment in Trillion to $0 and that it and the other shareholders are not willing to contribute equity capital to Trillion.   Meritage has not offered to assist Trillion in finding any other financing.

92.     These new service contracts (if the corresponding infrastructure is built), will add significant value to Trillion.   Tatonka anticipates that a receiver for Trillion could obtain financing for these new contracts.

<u>**COUNT I**</u>
<u>**BREACH OF CONTRACT BY TRILLION**</u>

93.     Tatonka incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

94.     Trillion is in default of its obligations under the Trillion Tatonka Loan Documents, including, without limitation, the RMPA, the Revolving Construction Note, the

Working Capital Note, the February 2009 Purchase Agreement, the February 2009 Note, the June 2009 Note and the Restructuring Agreement.

95.     Trillion has failed to pay Tatonka the amounts due under the terms of the Trillion Tatonka Loan Documents.

**WHEREFORE**, Tatonka demands a money judgment against Trillion for the principal indebtedness outstanding under the Loans, plus accrued and accruing interest, late charges, and expenses of collection, including attorneys' fees and the costs of this action.

**COUNT II**

**APPOINTMENT OF A RECEIVER**

96.     Tatonka incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

97.     Trillion is in default of its obligations under the Trillion Tatonka Loan Documents.

98.     A contract between Tatonka and Trillion provides for the appointment of a receiver for Trillion upon Trillion's default.

99.     Moreover, a receiver for Trillion would fill the current vacuum of corporate governance, preserve jobs, preserve the value of Tatonka's collateral, and maintain the consistent provision of services to Trillion's Customers.

**WHEREFORE**, Tatonka demands a judgment against Trillion for the appointment of a receiver and judgment in Tatonka's favor for the principal indebtedness outstanding under the Loans, plus accrued and accruing interest, late charges, and expenses of collection, including attorneys' fees and the costs of this action.

Date: July 8, 2011                          /s/ Michael Leo Hall
                                            Michael Leo Hall
                                            Derek F. Meek
                                            **BURR & FORMAN LLP**
                                            420 North 20th Street
                                            Suite 3400
                                            Birmingham, Alabama  35203
                                            Telephone: (205) 251-3000
                                            Facsimile: (205) 458-5100


                                            /s/ Denis H. Mark
                                            Denis H. Mark
                                            **HAMILTON FAATZ AND WALLER, PC**
                                            5105 DTC Parkway
                                            Suite 475
                                            Greenwood Village, CO  80111
                                            Telephone: (303) 830-0500
                                            Facsimile: (303) 860-7855

                                            **ATTORNEYS FOR TATONKA CAPITAL
                                            CORPORATION**


**PLAINTIFF'S ADDRESS:**

Tatonka Capital Corporation
1441 18th Street
Suite 400
Denver CO 80202


**DEFENDANT'S ADDRESS:**

Trillion Partners, Inc.
c/o Corporation Service Company
1560 Broad, Suite 2090
Denver, CO 80202