IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 11-cv-01787--MSK-MJW

TATONKA CAPITAL CORPORATION,        )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
TRILLION PARTNERS, INC.,            )
                                    )
                                    )
            Defendant.              )
                                    )

## RECEIVER'S FINAL REPORT

Byron P. Smyl, the court-appointed receiver (the "Receiver") for Trillion Partners, Inc. ("Trillion"), through his undersigned counsel, for his final report pursuant to ¶15 of the Order Granting Motion to Appoint Receiver (the "Appointment Order"), states as follows:

### Monthly Reports

1.      In the Appointment Order, the Court ordered the Receiver, to make an accounting of all revenues collected and all fees and expenses paid for the previous month, to file such accounting with the Court, and to serve it upon Plaintiff, Tatonka Capital Corporation ("Tatonka"), Trillion, and any other party appearing in this case. The Receiver has filed all such reports for the period from the date of his appointment, July 27, 2011, through July 31, 2011, and for all monthly periods thereafter from August 2011 through May 2016. The Receiver incorporates all such reports into this final report by reference.

**The Sale Motion and Order**

2. On August 27, 2012, the Receiver file his *Motion To Approve The Private Sale Of All Of Trillion's Assets, Or In The Alternative, Approval Of Sale And Bidding Procedures For A Public Sale* (the "Sale Motion") (Docket No 70).  In the Sale Motion, the Receiver requested authority to sell substantially all of Trillion's assets through a private sale to TX Broadband Holding Co. ("TX Broadband") through an Asset Purchase Agreement of even date (the "APA") ("Exhibit A" to the Sale Motion) or, in the alternative only, the approval of bidding procedures for a public sale of Trillion's assets.

3. On October 26, 2012, the Court granted the primary relief requested by the Sale Motion and authorized the private sale of Trillion's assets to TX Broadband pursuant to the APA through the entry of it Order Approving the Private Sale of All of Trillion's Assets (the "Sale Order") (Docket No. 75).

**Amendments to the APA**

4. Pursuant to ¶ 17 of the Sale Order, the Receiver was authorized to execute amendments to the APA without further order of the Court absent material change to the terms of the APA or the Sale Order.

5. The Receiver and TX Broadband executed two such amendments, copies of which are attached hereto as "Exhibit 1" and "Exhibit 2."

**Regulatory Approvals**

6. Under the APA, the sale and transfer of Trillion's Federal Communications Commission licenses (the "FCC Licenses") and California Public Utilities Commission Licenses (the "CLEC Licenses") were contingent upon the approval of the FCC and the CPUC.

7. After a longer than anticipated application process, the FCC approved the transfer of the FCC Licenses through an entry on the FCC's Universal Licensing System on September 27, 2013. (The FCC later confirmed the action it had taken on September 27, 2013 through a Public Notice issued on October 23, 2013.) Based on the FCC's approval of the license transfers, a closing on all Receivership Assets[1] (other than Excluded Assets and assets located in California) occurred on October 18, 2013.

8. Thereafter, the CPUC approved the transfer of the CLEC licenses through a Decision Authorizing Transfer of Control issued on November 19, 2013. Thus, the closing on Trillion's California assets occurred on November 20, 2013.

9. As a result of the FCC and CLEC approvals, the sale transaction contemplated by the APA has been fully consummated.

### Disposition of Excluded Assets

10. Under the APA, one of Trillion's assets, it rights relating to a plot of land situated in Jefferson County, Alabama (the "Tower Site"), was excluded from the sale. Upon investigation, the Receiver subsequently determined that over a year before the Appointment Order was entered, specifically, on May 25, 2010, the Tower Site had been sold to the State of Alabama for taxes. To redeem the property, the Receiver would have been required to pay the sum of $4,358.33 for unpaid taxes through the 2013 tax year plus property taxes that had accrued since then. To determine whether the Tower Site had any value, the Receiver retained a real estate broker, on a contingent fee basis, to market the property. After numerous marketing

---

[1] All capitalized terms that are not expressly defined herein have the same meanings as those assigned in the Sale Motion or the APA as the case may be.

attempts, including contacting adjacent property owners and listing the property on the local Multiple Listing Service, it became clear that the Tower Site had very little if any market value. Moreover, not only may the value of the property be less than the amount of the redemption price, but also, the Tower Site based on the neglected condition of the property, reacquiring title might subject the receivership estate to as yet unknown liabilities. Therefore, in the sound exercise of his business judgment, the Receiver has determined that does not make economic sense for him to exercise the estate's right to redeem the Tower Site for unpaid taxes. Accordingly, the right to redeem the Tower Site for unpaid taxes has been abandoned to Trillion.

### Post-Closing Activities

11. After Trillion's assets, other than the right to redeem the Tower Site for unpaid taxes, were transferred to TX Broadband pursuant to the APA, the Receiver ceased operating Trillion's business and, instead, focused his efforts on winding down Trillion's business affairs. Those efforts included, but were not limited to, review and analysis of purchase price allocation, filing final reports with the Universal Service Administrative Company, and filing federal, state and local tax returns for fiscal years 2013 and 2014.

### Distributions to Pre-Receivership Creditors

12. Before the Sale Motion was filed, the Receiver had offered certain settlement amounts to all known pre-Receivership trade creditors in exchange for a full and final release of their claims. Only two such trade creditors, American Express and Masergy Communications, Inc. accepted the Receiver's settlement offer before the Sale Motion was filed. After the Sale Motion was filed, the Receiver refrained from making any further payments to pre-Receivership

trade creditors pending a determination of whether there were sufficient funds in the Receivership estate to fully fund all priority tax liabilities.

13. The Sale Motion set aside up to $120,000 in cash to be distributed to Unsecured Creditors (as defined in the motion) provided such funds were available. After filing Trillion's tax returns for 2013 and 2014, the Receiver determined the estate would be able to make a distributions totaling up to a maximum of $120,000 to pre-receivership creditors.

14. Based on the accounts payable information in Trillion's books and records, in August 2015, the Receiver caused payments to be made to the following Unsecured Creditors:

| Vendor Name | General Unsecureds | Payout Rate | Payout Amount |
|---|---|---|---|
| Bank Street Group, LLC | $114,646.15 | 20.00% | $ 22,929.23 |
| Columbus County Tax Administrator | $ 3,018.27 | 50.00% | $ 1,509.14 |
| DLA Piper Rundick Gray Cary | $ 87,520.99 | 20.00% | $ 17,504.20 |
| Fontaine & Kelley, LLP | $ 2,252.73 | 50.00% | $ 1,126.37 |
| Hogan & Hartson, LLP | $ 80,000.00 | 20.00% | $ 16,000.00 |
| Holme Roberts & Owen LLP | $ 2,799.00 | 50.00% | $ 1,399.50 |
| James E. Dovey | $ 2,532.10 | 50.00% | $ 1,266.05 |
| Laura Lee Taylor | $ 73.60 | 50.00% | $ 36.80 |
| Maxwell, Locke & Ritter | $ 24,290.00 | 20.00% | $ 4,858.00 |
| Meritage Holdings, LLC | $ 4,735.40 | 50.00% | $ 2,367.70 |
| PMB Helin Donovan, LLP | $ 39,150.00 | 20.00% | $ 7,830.00 |
| Tax & Accounting - R&G | $ 3,190.79 | 50.00% | $ 1,595.40 |
| Wilkinson, Barker & Knauer, LP | $ 3,060.00 | 50.00% | $ 1,530.00 |
| **Subtotal** | **$367,269.03** | | **$ 79,952.37** |
| *PreReceivership Uncleared Checks* | | | |
| Matt Cunningham | $ 100.00 | 50.00% | $ 50.00 |
| Jefferson Co. Dept of Revenue | $ 18.32 | 50.00% | $ 9.16 |
| Atco Communications | $ 390.00 | 50.00% | $ 195.00 |
| City of Eloy, AZ | $ 150.00 | 50.00% | $ 75.00 |
| Scott Smith | $ 5.00 | 50.00% | $ 2.50 |
| **Subtotal** | **$ 663.32** | | **$ 331.66** |
| **Total** | **$367,932.35** | | **$ 80,284.03** |

15.     With the exception of the checks to Matt Cunningham and the Jefferson County, Alabama Department of Revenue, the Receiver has been able to verify that all of the foregoing checks were received by the Unsecured Creditors and have been negotiated. With respect to the check to Matt Cunningham, the check was originally sent via certified mail, but was not claimed. The check was resent via ordinary mail and was not returned. Nonetheless, even several months later, the check had not been negotiated. Thus, the Receiver issued a stop payment order on the check, and TX Broadband has agreed to assume the liability. Regarding the check to the Jefferson County, Alabama Department of Revenue, the check was received on August 18, 2014, but has not been negotiated. The Receiver has since determined that the occupational tax upon which the book liability was based was declared unconstitutional by the Alabama Supreme Court. Because the tax liability is not a valid liability, the Receiver issued a stop payment order on the check.

## Trillion Liquidated but not Dissolved

16.     As a result of the sale of substantially all of Trillion's assets to TX Broadband and the Receiver's post-closing activities, the business affairs of Trillion have been completely wound down and all of its assets have been liquidated. Nonetheless, Trillion continues to exist as a legal entity. According to the website of the Secretary of State for the State of Delaware, where Trillion was incorporated, Trillion, through the Receiver, last filed an annual report for the year 2014. Because Trillion has no assets, no income, and no business, after the receivership estate has been closed, it is simply a matter of time before it will no longer be able to pay franchise taxes and the Delaware Secretary of State administratively dissolves Trillion for nonpayment of franchise taxes. See 8 Del. C. § 501.

17. The Receiver has considered the issue of whether he has any legal authority to dissolve Trillion. It is the Receiver's considered judgment that he does not have any such authority and, even if he did, it should not be exercised under the circumstances of this case.

18. Regarding whether the Receiver has the legal power to dissolve Trillion, in *Grocery Supply, Inc. v. McKinley Services, Inc.,* 128 F. Supp. 694, 696 (D. Alaska Terr. 1955), the court, in the context of a discussion regarding whether a federal court has the power to dissolve a corporation in receivership, observed that "in the absence of statute, equity does not have the power to destroy that which the state has created (citing 2 Clark on Receivers, 2d Ed., 1033, Sec. 703)." The Receiver has not been able to find any federal statute that grants federal courts or federal equity receivers the power to dissolve a corporation that was incorporated under state law.

19. Since this is a diversity case, one could argue that the substantive law of the state of Delaware, the state in which Trillion was incorporated, applies. Even if that were the case, there is no Delaware statute that expressly grants a court or a receiver the power to dissolve a corporation. In a recently decided Delaware case, *Williams v. Calypso Wireless, Inc*., 2012 WL 424880 (Del. Ch. Feb. 8, 2012), the court found that the Delaware statute which sets forth a receiver's powers, 8 Del. C. § 322, impliedly authorized the court to appoint a receiver to dissolve a corporation. Thus, the court ruled that, [u]nder the circumstances, the receiver I appoint will be charged with dissolving Calypso and winding up its affairs." The circumstances in *Calypso*, however, were very different, however, than this case, including the fact that Calypso was a publicly traded company. The court emphasized that "[i]n granting this remedy, I have given particular consideration to its potential effect on innocent stockholders." Trillion is

not publicly traded and, if any of the current shareholders attempted to sell their shares, even the most rudimentary due diligence by a prospective buyer would reveal that the company has been in receivership and had no assets. Thus, even if the Delaware statute could be construed as impliedly authorizing a receiver to dissolve a Delaware corporation, *Calypso* suggests that it will only be done when circumstances so warrant.

20. This approach is consistent with the only federal case the Receiver has been able to find on the subject. In *Smith v. Aeolian Co.*, 53 F. Supp. 636, 638 (D. Conn. 1943), the court ruled that "[t]he formal cancellation of the franchise to operate granted to the corporation by the state is not necessary in the usual case to the carrying out of the functions of receivership by the courts." The Receiver sees no reason why this case is not a "usual case."

21. Finally, since Trillion has no board of directors, officers, or employees and no assets, income, or business operations, it will not have either the personnel or the funds to pay franchise taxes. Therefore in due course, under Delaware law, "the charter of the corporation shall be void, and all powers conferred by law upon the corporation are declared inoperative." 8 Del. C. § 510. In short, through the mere passage of time (and non-payment of the required tax) Trillion, in due course, will be administratively dissolved under Delaware law. Thus, unlike *Calypso*, there is no need for the Receiver to dissolve Trillion.

### Funds held in Escrow and in Trust

22. Pursuant to Section 3.2 of the APA, on or about October 18, 2013 the sum of $884,997.73 was deposited into an account Regions Bank under and Escrow Agreement between the Receiver, TX Broadband, and Regions Bank (the "Escrow Account") for the purpose of

funding payments of tax liabilities of Trillion and other post-closing expenses. As of the date of the filing of this Report, the sum of $15,766.79 remains in the Escrow Account.

23. To fund the Receiver's legal expenses after the closing on the APA, funds were deposited into the trust account of counsel for the Receiver (the "Trust Account"). As of the date of the filing of this Report, the sum of $10,000.06 remains in the Trust Account.

24. Under Section 3.2 of the APA, any funds remaining in the Escrow Account and the Trust Account must be refunded to TX Broadband incident tot the termination of the Escrow Agreement and the closing of the Receivership estate. After any unpaid fees and expenses of the Receiver and his professionals have been paid in full, all remaining funds in the Escrow Account and the Trust Account will be transferred to TX Broadband.

Respectfully submitted this 30th day of June, 2016.

      *s/ John Cardinal Parks*
JOHN CARDINAL PARKS, #18669
LEWIS BRISBOIS BISGAARD & SMITH, LLP
1700 LINCOLN STREET, SUITE 4000
DENVER, CO 80203
TELEPHONE: 303-861-7760
FAX: 303-861-7767
E-MAIL: john.parks@lewisbrisbois.com

*Counsel for Byron P. Smyl, as receiver for Trillion Partners, Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 30th, 2016, a true and correct copy of the foregoing **RECEIVER'S FINAL REPORT** was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

    Denis H. Mark
    Hamilton Faatz and Waller, P.C.
    5105 DTC Parkway, Suite 475
    Greenwood Village, CO 80111
    dmark@hfwpc.com

    Michael Leo Hall
    Derek F. Meek
    Burr & Forman LLP
    420 North 20th Street
    Birmingham, AL 35203
    mhall@burr.com

    Todd R. Seelman
    Lewis, Brisbois, Bisgaard & Smith, LLP
    1700 Lincoln Street, Suite 4000
    Denver, CO 80203
    Todd.seelman@lewisbrisbois.com

                             *S/ JOHN CARDINAL PARKS*
                             JOHN CARDINAL PARKS, #18669
                             LEWIS BRISBOIS BISGAARD & SMITH, LLP
                             1700 LINCOLN STREET, SUITE 4000
                             DENVER, CO 80203
                             TELEPHONE:  303-861-7760
                             FAX:  303-861-7767
                             E-MAIL:  john.parks@lewisbrisbois.com

                             *Counsel for Byron P. Smyl, as receiver for Trillion Partners, Inc.*